FILED

2021 Apr-27  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **BATHSHEBA ENTERPRISES, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.:** |
| **v.** | ) | |
| | ) | |
| **WOODLANDS OF TUSCALOOSA (DE) LLC** | ) | _____ |
| | ) | |
| **Defendant** | ) | **Jury Demanded** |
| | ) | |
| | ) | |

## COMPLAINT

COMES NOW the Plaintiff, Bathsheba Enterprises, LLC by and through its attorney, and brings this action against Woodlands of Tuscaloosa (DE) LLC. Plaintiff contends that the Defendant violated 42 U.S.C. § 1981 and breached a contract between the parties, causing Plaintiff damages.  In support thereof, Plaintiff states the following:

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon the Court by 28 U.S.C. §1331, 42 U.S.C. §1981 and 42 U.S.C. §1988, and the law of supplemental jurisdiction over state law claims that arise from the same operative facts as a federal claim.

2.    This Court has personal jurisdiction over Defendant because the cause of action arose within this district as a result of Defendant's conduct within this District and Division.

3.    Venue is proper in the Northern District of Alabama, Western Division because this is a judicial district where the Defendant maintains a working presence, where the subject contract was executed and due to be performed and where a substantial part of the events or omissions giving rise to the claim occurred.

## PARTIES

4.    Plaintiff Bathsheba Enterprises, LLC (hereinafter "Bathsheba Enterprises") is an Alabama domestic limited liability company based and located in Tuscaloosa, Alabama and that does business in the Western Division of the Northern District of the State of Alabama by operating a janitorial cleaning business.

5.    Defendant Woodlands of Tuscaloosa (DE) LLC, (hereinafter "Woodlands") is an out-of-state limited liability company registered to do business in Alabama and that does business in the Western Division of the Northern District of the State of Alabama by operating an apartment complex located at 1100 Hargrove Road East, Tuscaloosa, Alabama.

## FACTUAL SUMMARY

6. Plaintiff incorporates and re-alleges paragraphs 1–5 of this Complaint as if set forth fully herein.

7. Plaintiff Bathsheba Enterprises is a limited liability company that is solely owned by two African-American members, and solely managed and operated by one of those members, Bathsheba Sesson (hereinafter "Sesson"), an African-American.

8. Bathsheba Enterprises operates a commercial cleaning business as a franchisee of the janitorial cleaning franchisor, DAZSER-BHM corporation d/b/a Jani-King of Birmingham (hereinafter "Jani-King").

9. Woodlands operates an apartment complex in Tuscaloosa, Alabama that was called, at the relevant time, Woodlands of Tuscaloosa (hereinafter, the "Woodlands Apartments").

10. In early 2019, Sesson and Samanatha Zarallo (hereinafter, "Zarallo"), the general manager of the Woodlands Apartments, entered into discussions regarding Bathsheba Enterprises performing commercial cleaning services of the apartments at the Woodland Apartments, including for the "turnover" of apartments that happens between tenants, which in the college town of Tuscaloosa, Alabama happens at the same time on a large scale basis in early August before the new school year starts.

11.    Sesson and Zarallo met in person, talked on the phone multiple times and walked through the apartment complex and example apartments together and discussed the cleaning needs.  Zarallo directed Sesson to send in a bid for the needed services and provided Sesson with a form bid application/Request for Proposal ("RFP") that described the needed cleaning services.  Zarallo pointed out to Sesson that Woodlands was sending the RFP to multiple cleaning companies and that Woodlands would contract with more than one cleaning company to handle the high volume of apartments that needed to be cleaned during the turnover, so the number of apartments allowed to cleaned by each contractor would be based on the efficiency and speed with which they were cleaned.  Given that, it was discussed that Sesson and Bathsheba Enterprises would make more money if they worked in a manner that would result in them cleaning more apartments, getting a bigger piece of the cleaning pie.  Sesson told Zarallo that she appreciated learning that, and that as an owner that she would personally make sure that the cleaning was done thoroughly but also fast, so they could clean more apartments and she could make more money.

12.    Sesson, on behalf of Bathseba Enterprises, shared the RFP with Jani-King and alerted Jani-King that Bathsheba Enterprises had found[1] this cleaning job.

---

[1] As a franchisee,  if Bathsheba Enterprises finds a job, such as the subject Woodlands job made the basis of this complaint, then Bathsheba Enterprises comes up with suggested pricing and

Then Bathsheba Enterprises and Jani King worked together to complete the RFP/bid, which Sesson provided to the Woodlands. Sesson and Zarallo discussed the RFP/Bid and Zarallo let Sessons know that her company would be one of the cleaning companies that would get one of the cleaning job slots at the Woodlands.

13.    In May of 2019, Zarallo sent a letter of intent via e-mail to Sesson providing information regarding Woodland's intent to utilize "you/your company" for the cleaning services, and referencing a "Services Agreement" contract that would come in the future and which would form a binding contract.

14.    As such, later in May of 2019, Zarallo provided to Sesson the aforementioned contract and asked Sesson to come to her office to sign it.  The contract, dated May 29, 2019, had Bathsheba Enterprises' franchisor, Jani-King, listed in the typed print as the "Vendor" on it.

15.    However, at the meeting between Sesson and Zarallo, scheduled by Zarallo so that Sesson could come sign the contract, and prior to the execution of the contract, it was discussed that Bathsheba Enterprises was going to be the actual vendor on the job, would be financially benefitted and positively affected by cleaning as many apartments as possible, and was the company that the Woodlands would be looking to if there were problems, not Jani-King.  Sesson asked Zarallo if

---

profits differently (and better) than on jobs found by Jani King, which are just assigned by Jani King to Bathsheba Enterprises.

she wanted or needed Sesson to get Jani King to sign the contract, given the typewritten designation of Jani King as the vendor on the contract form. Zarallo specifically said no and specifically directed Sesson to sign the contract herself as the owner of and on behalf of Bathsheba Enterprises, because but that was who Zarallo said that she considered to be the vendor on the job.  Zarallo and Sesson discussed that Bathsheba Enterprises was going to financially benefit from the contract and Zarallo said that Bathsheba Enterprises should be on the contract to be held responsible for it.

16.    Therefore, at Zarallo's direction, and in front of Zarallo, Sesson signed the contract on behalf of Bathsheba Enterprises, and hand printed on the signatory section of the contract that she was signing it as "Bathsheba Enterprise LLC/Owner." Zarallo then signed the contract on behalf of Defendant.

17.    On or about July 19, 2019, at the request of Woodlands, and arranged, scheduled and communicated about solely between Bathsheba Enterprises and Woodlands, Bathsheba Enterprises performed a "trial run" by cleaning seven apartments under the observation of Defendant.  All employees of Bathsheba Enterprises (including Sesson) wore nametags that identified them as employees of "Bathsheba Enterprises" (with no reference to Jani King), as vendor identifying nametags were required of all the vendor's employees while on the Defendant's premises per the Service Contract.

18.     During the trial run, it was again discussed by Defendant and Sesson that she and Bathsheba Enterprises would make more money if they were able to clean more apartments during the upcoming turnover project, but that the other cleaning vendor(s) would have that same opportunity.  Sesson discussed with Zarallo that she would likely increase her staffing that would cost her some additional expense, but that it would be worth it because that would allow Bathsheba Enterprises to clean more apartments.

19.     Obviously, the point of the trial run was just that, to determine if Plaintiff's crew cleaned apartments to Defendant's satisfaction. Had they not, they would not have been allowed to proceed as part of the turnover project.  Fortunately, the trial run was successful.  Zarallo and the Woodlands were pleased with Plaintiff's work, told Sesson that the work was good, and thus the Defendant proceeded with its engagement of Bathsheba Enterprises to participate with other contractors, such as painters, carpet vendors and the other cleaning/janatorial vendors in the Woodland's turnover cleaning and updating process at the apartment complex beginning on August 2, 2019.

20.     On or about August 2, 2019, on the very first day of that multi-day process, Plaintiff's work crews, which consisted of all African-American workers, were in the process of cleaning the apartments, when a shooting took place in one of the parking lots at the apartment complex (which still had some tenants at the time).

21.     Per witness accounts, the person who had fired the gun was an African-American who fled the scene in a vehicle.  Also per witness accounts, the person at whom the shooting was directed was also an African-American.

22.     The Plaintiff's work crew had absolutely nothing to do with the shooting, and there has never been one shred of evidence of any type to the contrary.

23.     The Plaintiff's work crew simply happened to be onsite at the time, working, fulfilling Bathsheba Enterprise's duties under the contract, when the shooting occurred.

24.     Also on site at the apartment complex at the time were many employees of multiple other contractors, although the other contractors, including the other janitorial/cleaning contractors, had either all or almost all Caucasian or Hispanic employees, in contrast to Plaintiff's all African-American workforce.

25.     The police came and investigated the shooting and did not make any finding or allegation that anyone from the Plaintiff's work crew was involved with the shooting.

26.     There simply was not, at the time or presently, one ounce of anything linking the Plaintiff's work crew to the shooting.  The only common factor between the Plaintiff and the participants in the shooting was that the shooter and victim were allegedly African-American and the Plaintiff's work crews were also made up of African-Americans.

27.     Despite that, after the shooting, inexplicably, Defendant ordered all Bathsheba Enterprises' personnel off of the property that very day, told Sesson that they would not be allowed back on the property the next day, or any day, and that the Defendant did not want them onsite ever again and would not allow them to perform any more cleaning services for them.

28.     Specifically, a Woodland's security guard asked Sesson the name of the shooter.  Of course, she had no idea.  He also asked if it was one of her workers had done the shooting.   When Sesson told him no, and showed him her roster of employees, he said that she was lying, and also told her to get off the property.  When she protested, he told her to hurry up and get off the property.

29.     Zarallo, specifically referring to and discussing the shooting, told Sesson that day that "we can't have that stuff on our property, so get your stuff and get out."  She then said "there is no need for you to come back tomorrow, or any other day."

30.     When a shocked Sesson pointed out that nobody at Bathsheba Enterprises had anything at all to do with the shooting, and asked if there was any facts or evidence or anything at all that indicated otherwise, Defendant just reiterated that she and the rest of the Plaintiff's workers had to leave the property.

31.   When Sesson again protested, and suggested that Zarallo look at surveillance video of the shooting to assure herself that none of Plaintiff's employees were involved in the shooting, Zarallo again just ordered her off of the property.

32.   Plaintiff was never allowed back on the property after the verbal termination of the contract by the Defendant.

33.   The Defendant never provided Plaintiff anything in writing in regard to the termination, or any problem with Plaintiff's services at any time.

34.   Defendant never gave Plaintiff or any person or entity any written notice of any alleged breach of contract on the part of Plaintiff or any related party.

35.   Defendant never gave Plaintiff or any person or entity any opportunity to cure any alleged breach of contract on the part of Plaintiff or any related party.

36.   At no time during the (obviously successful) trial run or the brief period of the cleaning of apartments that took place on that first and only day of the turnover that the Plaintiff worked, did Defendant ever complain or have any criticism or concern of the Plaintiff's performance of cleaning services.

37.   The only reason that Defendant terminated Plaintiff's provision of services and ordered them off of the property was the shooting, which the Defendant specifically referenced when doing so, which was only an hour after the shooting, and which was on the very first day of their provision of services during the weeks-long turnover.

38. In summary, Defendant racially profiled Plaintiff and its owner and employees. Defendant ordered Plaintiff of the property, didn't let Plaintiff return, and terminated Plaintiff's contract because it falsely and undisputedly inaccurately connected them with the shooting, with that connection being based solely on the fact that the Plaintiff's workers were African-American and the shooter was believed to be African-American. But for the Plaintiff's workers being African-American, Defendant would not have ordered them off the property, would have allowed them to stay on the property like all of the contractors that were onsite at the time of the shooting that had white employees, including the similarly situated other janitorial/cleaning crews, and allowed them to finish their contracts and finish working on the turnover project like the white contractors got to do. In fact, the white cleaning contractors made more money because the got plaintiff's share of the turnover cleaning pie after the Plaintiff was thrown off of the property.

39. As a result of the Defendant's termination of the contract, Plaintiff suffered significant damages including, but not limited to, loss of income, expenses, and opportunity.

40. In light of all the foregoing, it is clear that the Defendant terminated the subject contract simply because it was motivated in an unlawful manner in violation of 42 U.S.C. § 1981.

## COUNT ONE – Violation of 42 U.S.C. § 1981

41.    The Plaintiff incorporates and re-alleges paragraphs 1–40 of this Complaint as if set forth fully herein.

42.    Section 1981 of the Civil Rights Act, 42 U.S.C. §1981 ("Section 1981"), provides:

> a) Statement of equal rights
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

43.    Plaintiff Bathsheba Enterprises is a minority-owned company with an imputed racial identity that derivatively enjoys under Section 1981 the same legal right to the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship, as companies that are owned or controlled by white citizens or white citizens themselves.

44.   The subject contract is a "contract" within the meaning of Section 1981, meaning that under the law, African Americans and other racial minorities, including entities with imputed racial identities, have the same right to the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" as white citizens.

45.   The subject contract creates a "contractual relationship" between Defendant and the Plaintiff, either directly or as a third-party beneficiary, within the meaning of Section 1981, meaning that under the law, African Americans and other racial minorities have the same right to the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" as white citizens.

46.   Defendant violated Section 1981 against Plaintiff by racially profiling the Plaintiff, withholding the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship and terminating the subject contract in the manner in which they did based on the Plaintiff's racial makeup.

47.   Defendant violated Section 1981 as against Plaintiff by ordering them of the property, not allowing Plaintiff to finish out their contract, ignoring the Plaintiff's (undisputedly) accurate assertion that they had nothing to do with the

shooting on the property, and terminating the contract, all for the sole reason that Plaintiff's employees and the alleged shooter happened to be African-American.

48.    But for the fact that Bathsheba Enterprise's work crew was African-American, Defendant would not have withheld the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship and terminated the subject contract in the manner in which they did.

49.    Evidence of Defendant's discriminatory racial animus in denying Plaintiff the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship and terminated the subject contract includes (without limitation) the facts as alleged above and that:

a.  Defendant ordered Plaintiff and its African-American crew off the property and terminated the subject contract on the same day and within two hours of a shooting of the property that allegedly involved an African-American.

b.  Defendant referred to the shooting when ordering Plaintiff off the property and terminating the contract and told Sesson, while discussing the shooting, that "We can't have that stuff on our property, so get your stuff and get out."

c.  Defendant failed to articulate any legitimate business reasons for ordering Plaintiff and its African-American crew off the

property and terminating the subject contract at the time of doing so, even after Sesson repeatedly asked why Plaintiff was getting ordered off the property since they didn't have anything to do with the shooting, and after Sesson asked Zarallo to review the surveillance video of the premises during the shooting to satisfy themselves of that.

d.  Even after the passage of time and the lack of any criminal charges or evidence that Plaintiff's employees were, in any way, connected to the shooting, Defendant still did not allow Plaintiff back on the property to perform services.

e.  No white contractors or employees were ordered off the property, had their contracts or employment terminated, or were treated in a like manner as a result of the shooting. White contractors and employees of the Defendant, including but not limited to the similarly situated other contractors which did not have African-American employees received favorable treatment when compared to Plaintiff.

50.     As a direct and proximate result of the Defendant's unlawful conduct, the Plaintiff has suffered the abrupt loss of the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, the abrupt termination of the

contract, the loss of income, expenses, opportunity, time value of money and other compensation.

51. The Defendant's acts were intentional and/or taken with reckless or callous indifference to the Plaintiff's federally protected rights, thus entitling the Plaintiff to an award of punitive damages.

## COUNT TWO - Breach of Contract

52. The Plaintiff incorporates and re-alleges paragraphs 1–51 of this Complaint as if set forth fully herein.

53. Defendant entered into the subject contract to which Plaintiff, who, per the direction of the Defendant, and in the presence of the Defendant, signed the contract on the signatory section of the contract as "Bathsheba Enterprise LLC/Owner," and was either a party or a third-party beneficiary to the contract.

54. By terms of that contract, it could only be terminated before the services were completed "upon written notice in the event the other party has materially breached the Agreement and fails to cure such breach within a reasonable time following receipt of notice thereof."

55. The contract also called for Plaintiff to be fully paid certain amounts for the work that they did.

56.    Defendant breached the contract terminating it before the services were completed, with no written notice of a material breach and no opportunity to cure, and by not properly paying Plaintiff for services per the contract.

57.    As a direct and proximate result of Defendant' breach of contract, Plaintiff has suffered damages including but not limited to loss of compensation, lost income and business opportunities, and lost time value of money.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff respectfully requests that this Court grant the following relief:

A. Compensatory damages sufficient to make Plaintiff whole for all past, present and future economic or monetary losses that it has and will sustain due to the Defendant's unlawful conduct, to the fullest extent available under law.

B. Punitive damages against the Defendant to the fullest extent available under each count of the complaint, in amounts that are sufficient to punish the Defendant and deter others from like misconduct, to be determined at trial.

C. Costs of suit, including a reasonable attorneys' fees and expert fees pursuant to 42 U.S.C. § 1988; and

D. Award such other and further relief as may be permitted by statute or as

may be just and proper.

Dated this the 27th day of April, 2021.

Respectfully Submitted,

**/s/ David A. Hughes**
David A. Hughes (ASB-3923-U82D)
Attorney for Plaintiff
2121 14th Street
Tuscaloosa, Alabama 35401
Telephone: (205) 523-0463
Fax: (205) 344-6188
E-mail: dhughes@hardinhughes.com

## **JURY DEMAND**

Plaintiff demands a trial by struck jury herein.

**/s/ David A. Hughes**
OF COUNSEL

**Please serve Defendant at:**

Woodlands of Tuscaloosa (DE) LLC
c/o its Registered Agent, Jennifer Roswald
200 16th Street
Birmingham, AL 35233